IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 75075-5-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| GARY BERNARD SANDERS II, | ) | |
| | ) | UNPUBLISHED OPINION |
| Appellant, | ) | |
| | ) | |
| COREY ASTANLIVIN MANN, | ) | |
| | ) | |
| Defendant. | ) | FILED: October 22, 2018 |

SCHINDLER, J. — Gary Bernard Sanders II seeks reversal of the jury conviction

for felony murder in the first degree. Sanders claims the trial court erred in refusing to

give a clarifying instruction during jury deliberations and insufficient evidence supports

the jury finding him guilty of the predicate crime of burglary in the first degree. The to-

convict jury instruction and the instruction on the statutory affirmative defense to felony

murder in the first degree accurately state the law. The jury instructions made the law

manifestly apparent and when read as a whole, were not ambiguous. The court did not

abuse its discretion by instructing the jury to consider the instructions as a whole and

refusing to give a clarifying instruction. We also conclude sufficient evidence supports

the jury finding Sanders guilty of the predicate crime of burglary in the first degree, and affirm the jury verdict.

## FACTS

In 2013, 24-year-old Latasha Walker lived with her boyfriend Kenneth McGee in an apartment in Kent. McGee sold Oxycodone. Tiana Rose Wood-Sims lived across the street with her mother, her stepfather, and the young twins of her cousin Corey Astanlivin Mann.

Wood-Sims started spending time with Walker in 2013, "hanging out" and using drugs. Wood-Sims told her cousin Mann that McGee kept drugs and a "couple thousand" dollars in the bedroom dresser and closet in the apartment. Wood-Sims suggested Mann steal the money and drugs while McGee was in jail on a probation violation. Wood-Sims would take some of the drugs and Mann would keep the money and the remainder of the drugs. Wood-Sims planned to spend the day with Walker away from the apartment so Mann could steal the money and drugs from the apartment.

On June 3, 2013, Mann borrowed a Chevrolet Malibu. Mann and his sister's fiancé Gary Bernard Sanders II drove from Everett to Burien to pick up Michael Vincent Galloway. Mann told Galloway that he planned to commit a "robbery" to get "$15,000 and a bunch of pills." Mann told Galloway that "his cousin had it set up." Mann showed Galloway a text message from Wood-Sims saying the "money and the pills" were "in a sock in the dresser drawer." Galloway agreed to go with Mann and Sanders. But Galloway told Mann and Sanders he first "wanted to go to my house so I could grab my gun." Galloway got the gun and "tucked it into [his] shorts." Because it was "bulging

2

out," Galloway decided to put the gun in the trunk of the car. Mann and Wood-Sims exchanged approximately 62 text messages that day.

Unbeknownst to Wood-Sims and Mann, McGee had been released from jail on June 3. McGee did not tell Walker because he wanted to "surprise her." McGee went to the apartment but "[n]obody was there." McGee "grabbed some money," changed his clothes, and left.

While waiting at the apartment complex in Kent, Mann got a text from Wood-Sims saying she and Walker were in the apartment. After Wood-Sims sent the text to Mann, Walker "noticed that money was missing and someone had been in the apartment" and called McGee's brother.

Minutes after Wood-Sims and Walker arrived at the apartment, Galloway knocked on the door. When Wood-Sims asked, "[W]ho is it," Galloway said he was "her neighbor" and he needed "a phone" or "jumper cables." Wood-Sims knew the men were there to steal the money and pills. Wood-Sims turned the lock to open the door so they could "come in . . . [t]o get money and drugs."

Galloway, Mann, and Sanders "rushed" into the apartment. Sanders and Galloway pushed Wood-Sims onto the couch, put a pillow over her face, and Sanders took her cell phone. Mann told Sanders and Galloway to stop because "she's part of it."

Mann and Galloway went into the bedroom. Sanders stayed in the living room. Wood-Sims heard Walker say, "[W]hat's going on," then heard "tussling" and Mann and Galloway "say, where's the money." Walker said, "[H]old on, hold on," and yelled for Wood-Sims. Wood-Sims did not respond. When "[i]t got quiet after a second," either Galloway or Mann "called Sanders into the room." Wood-Sims told Sanders to "check

3

the closet." After Sanders went into the bedroom, Wood-Sims heard "stuff being thrown around" and riffling.

When Wood-Sims approached the bedroom door, Mann, Galloway, and Sanders came out of the bedroom carrying a "briefcase type thing" and a "pillowcase with things in it." Wood-Sims saw Sanders take some video game equipment from the living room. Before they left, Mann slapped Wood-Sims in the face "to make this look legit."

Wood-Sims found Walker slumped against the dresser on the floor in the bedroom. Her pants were torn and partially pulled down and there was a belt around her neck. When Walker did not respond, Wood-Sims ran to get help. A neighbor called 911 and performed CPR[1] on Walker. When paramedics arrived, Walker had "no pulse." She "was not breathing" and the cardiac monitor showed a "flat line."

Medical examiner Dr. Aldo Fusaro performed an autopsy. Walker had bruises on her face and lacerations in her mouth from "blunt force" to her face. Dr. Fusaro concluded Walker died from multiple, severe blunt force injuries to her liver, including one laceration that left "the left lobe of the liver . . . almost torn off from the rest of the liver," that caused her to bleed to death.

McGee reported a number of items were stolen from the apartment, including two laptops, diamond earrings, a gold Michael Kors watch, and baseball hats.

Wood-Sims, Galloway, Mann, and Sanders gave statements to the police. On March 5, 2014, Sanders told the police he had been "part of a robbery, at Latasha Walker's home, in June of 2013."

---

[1] Cardiopulmonary resuscitation.

On March 12, 2014, the State charged Galloway, Mann, Wood-Sims, and Sanders "and each of them" with felony murder in the first degree of Latasha Walker. The information alleged that on June 3, 2013, "in the course of and in furtherance of" committing robbery in the first or second degree and "in immediate flight therefrom," the defendants caused the death of Walker in violation of RCW 9A.32.030(1)(c). Wood-Sims and Galloway pleaded guilty to murder in the second degree and agreed to testify at trial.

The State filed an amended information charging Mann and Sanders with felony murder in the first degree of Latasha Walker. The information alleged that in the course of and in furtherance of committing robbery in the first or second degree or burglary in the first degree, the defendants caused the death of Walker in violation of RCW 9A.32.030(1)(c). Mann and Sanders pleaded not guilty.

RCW 9A.32.030(1)(c) defines the crime of felony murder in the first degree as follows:

> A person is guilty of murder in the first degree when . . . [h]e or she commits or attempts to commit the crime of either . . . robbery in the first or second degree . . . [or] burglary in the first degree, . . . and in the course of or in furtherance of such crime . . . , he or she, or another participant, causes the death of a person other than one of the participants.

RCW 9A.32.030(1)(c) states it is an affirmative defense to felony murder in the first degree if the defendant is "not the only participant in the underlying crime" and the defendant establishes by a preponderance of the evidence that he:

> (i) Did not commit the homicidal act or in any way solicit, request, command, importune, cause, or aid the commission, thereof; and
> (ii) Was not armed with a deadly weapon, or any instrument, article, or substance readily capable of causing death or serious physical injury; and

(iii) Had no reasonable grounds to believe that any other participant was armed with such a weapon, instrument, article, or substance; and

(iv) Had no reasonable grounds to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury.

The State called over 20 witnesses during the four-week jury trial, including Wood-Sims, Galloway, the medical examiner, and detectives. The court admitted into evidence more than 50 exhibits.

Wood-Sims testified that the original plan "was us to not even be there" but the "plan evolve[d] as it went along." Wood-Sims said Galloway knocked on the door and asked if he could use the phone "because something happened with his car; he was her neighbor." Walker thought it was McGee's brother and went into the bedroom. Wood-Sims testified that "we had cocaine out" and McGee's brother "didn't know that [Walker] was doing drugs; so she kind of panicked. So she said, go get the door, and she shut the bedroom door." Wood-Sims said that "then I asked her, can I open the door? I told her that it was her neighbor, and she said, go ahead, let them use the phone."

Wood-Sims testified that when Sanders left the living room to go into the bedroom, she told Sanders to "check the closet."

Wood-Sims testified that she pleaded guilty to murder in the second degree and the State would recommend 220 months in prison. "Because I'm not innocent of Latasha's death. And I do need to pay my dues to her, to her family, and to society, and it's just that I have to do that for Tasha. That's just what's right."

Galloway testified he did not take his gun into Walker's apartment. Galloway said Sanders pushed Wood-Sims onto the couch in the living room but Mann told him to stop because "she's part of it." Galloway testified that while he searched the dresser,

6

Mann wrestled with Walker in the bedroom. When Galloway "couldn't find" any money or drugs in the dresser, he searched the closet. Galloway testified that while he searched the bedroom closet, Sanders and Mann were "on the bed with [Walker], struggling."

Galloway testified that he saw Mann hold Walker from behind, with her back to his chest, and he had "her arms pinned close to her side." Sanders "was on top of her, holding her down." Walker was "trying to fight her way from the struggle." As Galloway walked out of the bedroom to search a second bedroom, he saw Sanders "hit [Walker] up to four times in her stomach." When Galloway went back in the bedroom, he saw Walker lying facedown on the floor with a belt around her neck and Sanders sitting on the edge of the bed next to her, "holding onto the end" of the belt.

Galloway said he "grabbed everything that I thought I could sell." Galloway took baseball hats and a laptop. Galloway saw Sanders take "some Xbox controllers and some video games" from the living room. Galloway testified that before they left the apartment, Mann said, "[W]e got to make this look legit" and "hit [Wood-Sims] open-handedly, in her face."

Galloway testified that he, Mann, and Sanders drove to Burien. Galloway dropped off Mann and Sanders at the house where Mann's sister and her husband Dejuan Weems lived. Galloway picked up his girlfriend and drove home "a few blocks" away. Galloway testified that while he "was trying to retrieve my gun . . . from the trunk," he accidentally "left the keys sitting in there" and "slammed" the trunk closed. Galloway called Mann for help. Mann and Sanders took a taxi to Galloway's apartment. Mann broke the lock with a screwdriver and retrieved the keys to the car. Galloway, his

girlfriend, Mann, and Sanders drove to Everett. Galloway dropped off Mann and Sanders at Sanders' house on Casino Road. After about an hour, Galloway drove back to Burien with his girlfriend and Mann.

The court admitted into evidence the phone records for Walker, Wood-Sims, and Mann's cell phones. Kent Police Detective Brendan Wales testified the phone records for Walker's cell phone showed her Samsung Galaxy S3 "turned up" on the T-Mobile network "under somebody else's" phone number. Detective Wales testified that a coworker of Dejuan Weems had the Galaxy S3. The coworker said Weems sold him the phone.

Detective Wales testified the phone records for Wood-Sims' and Mann's cell phones showed there were more than 60 text messages between Wood-Sims and Mann on June 3, 2013. The June 3 phone records showed that after Wood-Sims' phone was stolen, the phone went from Kent, to Burien, and then "up to Everett." Detective Wales said that "[o]ne of the [cell phone] towers that . . . the phone used was on Casino Road." Detective Wales testified that Sanders lived on Casino Road in Everett. Detective Wales testified the June 3 records for Mann's cell phone showed the phone was in the "Burien area, then Kent near the time of the homicide, and then back to the Burien area, and then all the way to Everett later in the night."

Medical examiner Dr. Fusaro testified that Walker had abrasions on her chin and lower lip, lacerations on the inside of her lip, and contusions on her left cheek. Dr. Fusaro said there was more than a liter of "thick, bloody material" in Walker's abdomen as a result of "tears to both sides of her liver." Dr. Fusaro testified the injuries to

Walker's liver were caused by a "blunt force injury." Dr. Fusaro said Walker died from "blood in the abdomen, due to liver lacerations, due to blunt force injury."

Sanders called Juan Rodriguez to testify. Rodriguez testified that when in jail with Mann, Mann told him he "killed a girl the summer of 2013." Mann said, "[T]hey were going to go get pills or money or something, and it just went south from there." Rodriguez testified Mann said he "was beating her up" and the girl "stopped breathing." Mann told Rodriguez that his "sister's baby's daddy" Sanders and Galloway were "involved" and "helping him out."

On cross-examination, Rodriguez admitted that he previously told Detective Wales that Mann said "they were all beating her up" and both Galloway and Sanders "helped beat Latasha Walker." Rodriguez testified that Mann said he "hit the girl in the face" and Mann thought Sanders "had something in his hand when he hit Latasha Walker . . . because [Mann] heard a clunk."

Sanders testified. Sanders said he thought Mann was taking him "up to the mini-mart" on June 3, 2013. According to Sanders, after Mann kept driving, Sanders asked, "[W]here are you going." Mann told Sanders he "need[ed] to get some money." Sanders insisted neither Mann nor Galloway told him what they were "about to do." When they arrived at the apartment in Kent, Sanders said he "hesitated . . . and then [Mann] told me to come on." Sanders said he was "shocked" that Galloway asked someone inside the apartment for "jumper cables, or a phone or something." Sanders admitted Galloway had a gun but said the "first time [he] saw the gun" was in the apartment "on the way out."

Sanders testified that he did not push Wood-Sims, put a pillow over her face, or take her cell phone. Sanders said that while he was in the living room, he "heard a scream" and a commotion in the bedroom and then "it got quiet." Sanders testified either Mann or Galloway called him and he went to the bedroom but "didn't go inside the room." Sanders testified he saw "a woman on the floor" and Galloway and Mann were "looking for stuff." Sanders said he did not touch the belt or Walker. Sanders testified that before they left the apartment, Wood-Sims told Mann, "[Y]ou have to make it look good" but told him not to "slap me hard." Sanders said Mann slapped Wood-Sims "[j]ust one time, real hard," to "make it look like [Wood-Sims] was a victim."

Sanders testified that he did not take anything from the apartment. According to Sanders, after they drove to Galloway's apartment in Burien, Sanders told Mann to "get me home." Sanders testified that Mann called a taxi to take him home to Everett.

On cross-examination, Sanders admitted that on March 5, 2014, he told the detectives that he "had been part of a robbery, at Latasha Walker's home, in June of 2013." Sanders admitted he told the detectives that he had an agreement with Mann to "get $1,000 in return for [his] assistance with the robbery and the burglary." Sanders told the detectives that Mann "wanted me to look for the stuff, that the stuff would be in a drawer, that it would be some pills and some money." Sanders testified that he was in Walker's apartment "not because she invited" him in, but because he "was there to take her stuff."

Sanders admitted he told Detective Wales that he "went in" Walker's bedroom and "looked in the drawers while Michael Galloway and Mr. Mann were in the room." Sanders testified he was "able to look through the drawers . . . because Corey Mann

was physically restraining Latasha Walker" on the bed. Sanders testified that he "never saw" Galloway "touch" Walker. According to Sanders, while he and Galloway looked "for things in the dresser drawers," Mann grabbed Walker, "pulling her towards the bed[,] . . . choking her . . . or trying to hold her arms down." Sanders said that "at some point," he left the bedroom, then "returned to Latasha Walker's bedroom to find her with a belt around her neck." Sanders admitted telling the detectives that he "touched the belt around her neck." Sanders testified he tried to take the belt off Walker's neck but he "couldn't get it off." Sanders admitted he told the detectives her "jeans had been cut." Sanders insisted he "did not take anything" from the apartment and did not "hit Latasha Walker."

At the conclusion of the evidence, the State proposed giving a set of jury instructions as to Sanders only. The State proposed a jury instruction on the affirmative statutory defense to felony murder in the first degree. The State also proposed instructions on the lesser included crimes of robbery in the first degree and burglary in the first degree.

Sanders agreed and adopted the State's proposed jury instructions as "his own proposal." In addition, Sanders also proposed giving an instruction on felony murder in the second degree.

The jury instructions state, "The order of these instructions has no significance as to their relative importance. They are all important. . . . During your deliberations, you must consider the instructions as a whole." The court instructed the jury that "[a] separate crime is charged against each defendant. You must decide the case of each defendant separately. Your verdict as to one defendant should not control your verdict

as to the other defendant." The court instructed the jury on felony murder in the first degree and accomplice liability. The court instructed the jury on the lesser included crimes and the affirmative defense that applied to Sanders only. The jury instructions state that instructions 24A through 24I "apply only to defendant Gary Sanders." Jury instruction 24A states felony murder in the second degree, robbery in the first degree, and burglary in the first degree are the lesser included crimes of felony murder in the first degree. Jury instruction 24B defines felony murder in the second degree. Jury instruction 24C defines theft in the second degree. Jury instruction 24D defines attempted theft in the second degree. Jury instruction 24E defines "substantial step." Jury instruction 24F is the to-convict instruction for felony murder in the second degree. Jury instruction 24G is the statutory affirmative defense to murder in the first and second degree instruction. Jury instruction 24H is the to-convict instruction on robbery in the first degree. Jury instruction 24I is the to-convict instruction on burglary in the first degree.

The jury found Mann and Sanders guilty of felony murder in the first degree.

ANALYSIS

Sanders asserts the court violated his right to due process and to present a defense by refusing to give a clarifying instruction to the jury during deliberations. Sanders claims the to-convict jury instruction and the affirmative defense jury instruction were ambiguous.

The United States Constitution and the Washington State Constitution guarantee defendants the right to present a defense. U.S. CONST. amends. VI, XIV; WASH. CONST. art. I, § 22. We review a challenged jury instruction de novo. State v. Brett, 126 Wn.2d

12

136, 171, 892 P.2d 29 (1995). A jury instruction that misstates the law may be an error of constitutional magnitude. See State v. Marquez, 131 Wn. App. 566, 575-76, 127 P.3d 786 (2006). We review de novo alleged errors of law in jury instructions. State v. Barnes, 153 Wn.2d 378, 382, 103 P.3d 1219 (2005).

" 'Jury instructions are sufficient when they allow counsel to argue their theory of the case, are not misleading, and when read as a whole properly inform the trier of fact of the applicable law.' " State v. Knutz, 161 Wn. App. 395, 403, 253 P.3d 437 (2011)[2] (quoting State v. Aguirre, 168 Wn.2d 350, 363-64, 229 P.3d 669 (2010)). When read as a whole, jury instructions must make the applicable legal standard " 'manifestly apparent to the average juror.' " State v. LeFaber, 128 Wn.2d 896, 900, 913 P.2d 369 (1996), abrogated on other grounds by State v. O'Hara, 167 Wn.2d 91, 217 P.3d 756 (2009)[3] (quoting State v. Allery, 101 Wn.2d 591, 595, 682 P.2d 312 (1984)).

The court used 11 Washington Practice: Washington Pattern Jury Instructions: Criminal 26.04, at 366 (3d ed. 2008) (WPIC), to instruct the jury on the elements of the crime of felony murder in the first degree. The to-convict "Jury Instruction 13" states:

> To convict a defendant of the crime of Murder in the First Degree, each of the following elements of the crime must be proved beyond a reasonable doubt:
> (1) That on or about June 3, 2013, the defendant committed Robbery in the First Degree or Burglary in the First Degree;
> (2) That the defendant or another participant in the crime caused the death of Latasha Walker in the course of or in furtherance of such crime;
> (3) That Latasha Walker was not a participant in the crime of Robbery in the First Degree or Burglary in the First Degree; and
> (4) That any of these acts occurred in the State of Washington.
> If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a

---

[2] Internal quotation marks omitted.

[3] Internal quotation marks omitted.

verdict of guilty.

On the other hand, if, after weighing all of the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

The court used WPIC 19.01, at 291, to instruct the jury on the affirmative defense to felony murder in the first degree and felony murder in the second degree. WPIC 19.01 is based on the statutory affirmative defense, RCW 9A.32.030(1)(c) and .050(1)(b).[4] State v. Fisher, 185 Wn.2d 836, 848, 374 P.3d 1185 (2016); WPIC 19.01 cmt. at 292. Jury instruction 24G states:

It is a defense to a charge of Murder in the First and Second Degree that the defendant:

(1) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and

(2) Was not armed with a deadly weapon, or any instrument, article, or substance readily capable of causing death or serious physical injury; and

(3) Had no reasonable grounds to believe that any other participant was armed with such a weapon, instrument, article, or substance; and

(4) Had no reasonable grounds to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury.

The defendant has the burden of proving this defense by a preponderance of the evidence. Preponderance of the evidence means that you must be persuaded, considering all the evidence in the case, that

---

[4] The felony murder in the second degree statute RCW 9A.32.050(1)(b) includes the same affirmative defense as felony murder in the first degree, RCW 9A.32.030(1)(c). RCW 9A.32.050(1)(b) states:

A person is guilty of murder in the second degree when . . . [h]e or she commits or attempts to commit any felony, including assault, other than those enumerated in RCW 9A.32.030(1)(c), and, in the course of and in furtherance of such crime or in immediate flight therefrom, he or she, or another participant, causes the death of a person other than one of the participants; except that in any prosecution under this subdivision (1)(b) in which the defendant was not the only participant in the underlying crime, if established by the defendant by a preponderance of the evidence, it is a defense that the defendant:

(i) Did not commit the homicidal act or in any way solicit, request, command, importune, cause, or aid the commission thereof; and

(ii) Was not armed with a deadly weapon, or any instrument, article, or substance readily capable of causing death or serious physical injury; and

(iii) Had no reasonable grounds to believe that any other participant was armed with such a weapon, instrument, article, or substance; and

(iv) Had no reasonable grounds to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury.

it is more probably true than not true. If you find that the defendant has established this defense, it will be your duty to return a verdict of not guilty as to this charge.[5]

In State v. Gamboa, 38 Wn. App. at 409, 413, 685 P.2d 643 (1984), the court

held:

> The statutory defense, when read as a whole, negates none of the elements the State was required to prove, i.e., that the defendants took personal property from the victim by the use or threatened use of force, in the course of which activity the victim's death was caused. The defense merely permits an accused to disprove his participation in the homicidal act, not in the underlying felony, and to establish that he was not armed and was ignorant of his coparticipant's being armed and of the likelihood of death or serious physical injury.[6]

See also State v. Rice, 102 Wn.2d 120, 126, 683 P.2d 199 (1984).

The concluding instruction states, in pertinent part:

> When completing the verdict forms for defendant Gary Sanders, you will first consider the crime of Murder in the First Degree as charged. If you unanimously agree on a verdict, you must fill in the blank provided in verdict form A the words "not guilty" or the word "guilty," according to the decision you reach. If you cannot agree on a verdict, do not fill in the blank provided in Verdict Form A.
> If you find the defendant Gary Sanders guilty on verdict form A, do not use verdict forms B, C, or D. If you find the defendant not guilty of the crime of Murder in the First Degree, or if after full and careful consideration of the evidence you cannot agree on that crime, you will consider the lesser crime of Murder in the Second Degree. If you find the defendant not guilty of the crime of Murder in the Second Degree, or if after full and careful consideration of the evidence you cannot agree on that crime, you will consider both lesser crimes of Robbery in the First Degree and Burglary in the First Degree. You must consider each of these crimes separately. Your verdict on one crime should not control your verdict on the other. If you unanimously agree on a verdict for these crimes, you must fill in the blank provided in verdict form C and D the words "not guilty" or the word "guilty", according to the decision you reach.

---

[5] The WPIC 19.01 note on use at 291 states, "Use this instruction with WPIC 26.04, Murder—First Degree—Felony—Elements, and WPIC 27.04, Murder—Second Degree—Felony—Elements, which set forth the elements of felony murder in the first or second degree, when there are multiple participants and the statutory defense is in issue."

[6] Emphasis in original.

Sanders does not contend that the to-convict felony murder in the first degree jury instruction or that the statutory affirmative defense to felony murder jury instruction do not accurately state the law.[7] Sanders claims the instructions are ambiguous because the to-convict instruction states that if the jury finds the State has proved the elements of the crime "beyond a reasonable doubt, then it will be your duty to return a verdict of guilty," but the affirmative defense instruction states that if Sanders proves the affirmative defense by a preponderance of the evidence, "it will be your duty to return a verdict of not guilty" to the charge of felony murder in the first degree.

Considered as a whole, we conclude the instructions are not ambiguous and clearly address the relationship between the to-convict instruction and the affirmative defense instruction. The jury instructions state that during deliberations, the jury shall "consider the instructions as a whole." The first sentence of the affirmative defense instruction unequivocally states, "It is a defense to a charge of Murder in the First and Second Degree." The affirmative defense jury instruction states that if Sanders shows by a preponderance of the evidence that he did not commit the homicidal act, was not armed with a deadly weapon, had no reason to believe anyone else was armed, or had no reason to believe anyone else intended to engage in conduct likely to cause death or serious physical injury, it is a complete defense to felony murder in the first degree and the jury must find Sanders not guilty.

We review a trial court's decision as to whether to give further instructions in response to a request from a deliberating jury for abuse of discretion. State v. Brown,

---

[7] In the cases Sanders cites, LeFaber, 128 Wn.2d 896, and State v. Campbell, 163 Wn. App. 394, 260 P.3d 235 (2011), vacated on reconsideration by State v. Campbell, 172 Wn. App. 1009 (2012), the instructions did not accurately state the law.

132 Wn.2d 529, 612, 940 P.2d 546 (1997). A trial court's refusal to give a proposed jury instruction is reviewed for an abuse of discretion. In re Det. of Pouncy, 168 Wn.2d 382, 390, 229 P.3d 678 (2010). It is within the sound discretion of the trial court whether to give further instructions to a jury after it has begun deliberations. State v. Ng, 110 Wn.2d 32, 42, 750 P.2d 632 (1988). A trial court abuses its discretion only if its decision is manifestly unreasonable, rests on untenable grounds, or is made for untenable reasons. State ex rel. Carroll v. Junker, 79 Wn.2d 12, 26, 482 P.2d 775 (1971).

Where the instructions accurately state the law, the trial court need not further instruct the jury. Ng, 110 Wn.2d at 42-44. A court does not abuse its discretion by referring the jury to the instructions already given that correctly state the law. Ng, 110 Wn.2d at 42-44. Jury questions do not create an inference that the "entire jury was confused, or that any confusion was not clarified before a final verdict was reached." Ng, 110 Wn.2d at 43.[8] " '[Q]uestions from the jury are not final determinations.' " Ng, 10 Wn.2d at 43[9] (quoting State v. Miller, 40 Wn. App. 483, 489, 698 P.2d 1123 (1985)). " '[T]he decision of the jury is contained exclusively in the verdict.' " Ng, 10 Wn.2d at 43 (quoting Miller, 40 Wn. App. at 489).[10]

During deliberations, the jury submitted three "Jury Deliberations Question" forms. On the first day of deliberations, the jury submitted a Jury Deliberations

---

[8] Sanders also cites Recommendation 38 from the Washington State Jury Commission that states, "Trial judges should make every effort to respond fully and fairly to questions from deliberating jurors" and "should not merely refer them to the instructions without further comment." 11A Washington Practice: Washington Pattern Jury Instructions: Criminal, app. H, at 834 (3d ed. 2008).

[9] Alteration in original.

[10] We note that where, as here, a defendant agrees to and proposes a jury instruction, the defendant cannot challenge the instruction on appeal. State v. Henderson, 114 Wn.2d 867, 870-71, 792 P.2d 514 (1990).

Question: "Does the instruction # 13 apply to Defendant Gary Sanders." Sanders'

attorney and the prosecutor agreed the court should respond by stating, "Yes."

The next morning, the jury submitted a second Jury Deliberations Question:

As it relates to Defendant Sanders:

There are questions regarding the sequence of deliberations as it relates
to the instructions

. . . .

Question #1
If the jury determines that all of the elements of the crime as
identified in Instruction 13 are proven, how is the jury to apply Instruction
24G?

Question #2
If the jury determines that the defenses identified in Instruction 24G
are all proven out, how does that fact affect the proof established in
Instruction #13?[11]

Sanders proposed the court respond by stating, "If the jury agree that the four

factors in Instruction 24G have been established, the verdicts for Defendant Gary

Sanders on Verdict Forms A and B as to him should be Not Guilty." Sanders also

proposed submitting a special verdict form to the jury asking, "Do the jury find that each

of the four factors listed in Instruction 24G has been established." The court rejected

the proposed response and special verdict form. The court responded to the jury

inquiry by stating, "Please re-read your instructions carefully. The use of verdict forms

and how they are to be applied is contained within."

---

[11] Emphasis in original.

That afternoon, the jury submitted a third Jury Deliberations Question:

As it relates to Defendant Sanders:

Can the jury convict for murder in the 1st degree based upon item 13 as written, without consideration of instruction 24G.

Sanders argued the jury question was "ambiguous" and proposed the court give "a substitute To-Convict Instruction . . . for each offense, felony murder 1 and the lesser crime of felony murder 2, in which the To-Convict instruction for each offense adds the absence of the four factors of affirmative defense." The court rejected the request. The court responded, "You must consider all the instructions as a whole. Read the instructions in their entirety."

The following morning, the jury returned a verdict finding Sanders guilty of felony murder in the first degree.

There is no dispute the court fully and fairly responded to the first jury inquiry. Because the second jury inquiry specifically asked questions "regarding the sequence of deliberations" for the to-convict and the affirmative defense, we conclude the court did not abuse its discretion by rejecting Sanders' request to provide a supplemental instruction or a special verdict form and instructing the jury to consider the instructions as a whole and read the instructions in their entirety. Because the jury instructions made the law manifestly apparent and were not ambiguous, the court did not abuse its discretion in responding to the third jury question by instructing the jury that it must read the instructions in their entirety as a whole. We presume that jurors follow the court's instructions. State v. Kalebaugh, 183 Wn.2d 578, 586, 355 P.3d 253 (2015).

Sanders contends there is insufficient evidence to support the predicate crime of burglary in the first degree and the felony murder conviction. We considered and

19

rejected the same argument in <u>State v. Mann</u>, 4 Wn. App. 2d 1034, 2018 WL 3238683, at *5-*7.  We adhere to our decision in <u>Mann</u>.

We affirm the jury conviction of felony murder in the first degree.

_____

WE CONCUR:

_____  
Mann, ACJ

_____  
Trickey, J.P.T.